## SUPREME COURT.

JAMES N. WATSON agt. THE HARLEM AND NEW YORK
NAVIGATION COMPANY AND THE MORRISANIA STEAMBOAT
COMPANY.

*Injunction to restrain the combination or consolidation of two rival steamboat companies — parties.*

The defendants are rival steamboat companies organized under the act of 1854 (*Laws of* 1854, *p.* 518, *chap.* 232), and have been competing for the transportation of passengers and for public traffic for some years, the rivalry and competition between them being severe and keen. The tendency of this competition would naturally be for the benefit of the traveling public in reducing the rates of fares and freights. Suddenly these competitors come together and make an agreement for the purpose of running the boats of their respective lines for *joint* or *mutual benefit* or *account,* thus making a complete union of the interests of the two companies; at all events, providing for a joining of the companies for the protection of certain supposed *mutual interests.* *Held,* that such *combination* is in conflict with the provisions of section 22 of the act entitled "An act for the incorporation of companies formed to navigate the lakes and rivers," passed April 15, 1854, which provides that "No such company shall *combine* with any other company formed under this act for *any purpose.*"

*Held,* also, that the creation or formation of such monopolies is contrary to public policy and injurious to the public, and is the very thing the legislature designed by the provision of the statute to prevent.

The plaintiff, who is a stockholder in one of the corporations, sues on behalf of himself and of such other stockholders as shall elect to join in the action, joining both corporations as defendants   *Held,* that the action is properly brought.

*Special Term, January,* 1877.

THIS action was brought by the plaintiff, a stockholder in
The Harlem and New York Navigation Company, to cancel

and annul a certain agreement entered into between the defendants, for the purpose of running the boats of their respective lines, for joint or mutual benefit and account, and to prevent The Harlem and New York Navigation Company from parting with or surrendering any of its leases and franchises as provided in said agreement. The complaint alleged the solvency of The Harlem and New York Navigation Company, and the insolvency of The Morrisania Steamboat Company; the greater value of the landings and franchises of the former company as compared with those of the latter; that the agreement entered into was in conflict with an express statute of this State, and that the execution of said agreement was in violation of the by-laws of The Harlem and New York Navigation Company. A preliminary injunction was granted restraining the defendants from doing any matter, act or thing in relation to, or under said agreement, and on the hearing of the application to continue the injunction, Mr. Justice LAWRENCE delivered the following opinion, granting the application.

*Charles W. Dayton,* attorney, and *Albert Cardozo,* of counsel for plaintiff.

*Anderson & Young,* attorneys for defendant The Harlem and New York Navigation Company.

*Thomas L. Ogden,* attorney, and *Samuel E. Lyon,* of counsel for defendant The Morrisania Steamboat Company.

LAWRENCE, *J.* — The twenty-second section of the act entitled " An act for the incorporation of companies formed to navigate the lakes and rivers," passed April 15, 1854, provides that " no such company shall *combine* with any other company formed under this act *for any purpose,* or shall purchase, own or hold, or be interested in any stock or property of any other such company, unless the same shall have been

*bona fide* pledged, hypothecated, or transferred to such company by way of security for or in satisfaction or part satisfaction of a debt or debts previously contracted in the course of the transaction of the business of such company."

It is alleged by the plaintiff, who is a stockholder in the Harlem and New York Navigation Company, that the provisions of this section will be violated, if that company and the other defendant, The Morrisania Steamboat Company, are permitted to put into execution the contract or agreement made between the two companies, and bearing date the 6th day of October, 1876. That agreement provides in the first place, that the contracting parties mutually agree and covenant to operate their respective steamboat lines for their joint benefit.

For the accomplishment of this purpose, it is agreed that there shall be run and operated upon time tables, to be agreed upon during certain specified periods, a certain number of steamboats, unless otherwise *mutually* agreed upon ; that there shall be a freight tariff adopted, *which shall be strictly adhered to* by both companies ; that there shall be placed at each wharf or landing used by the parties, gates and gate keepers, *who shall receive the fares of passengers traveling by the companies' boats,* the expense of which shall be *equally borne ;* that the receipts of the boats shall be paid by the collector of each boat to the secretary of his company at the end of each round trip, and that the gate-keepers at the end of each day shall send their receipts to the agent of the two companies, &c. ; that the secretaries of each company shall pay over to the agent the receipts of their respective collectors on the following morning ; that the agent shall make an equal division of the receipts between the two companies daily ; an agent is named in the agreement, and provision is made for the appointment of his successor in case of his resignation or removal. The agreement further specified the places at which the landings of the boats shall be made.

These landings are to be jointly used and the expenses

attending them are to be *equally* borne. It is further agreed that all rents paid and moneys received of and from all docks from and after the date of the agreement which are now used by either of the parties, but which may not be used by said companies after this agreement is carried into effect, shall be equally paid and divided by and between the two companies, &c. Also, that the tickets of both companies shall be redeemed by either at the rate at which they were sold, and each party shall forthwith report to the other the number and amount of the tickets outstanding at the date of the agreement, and that hereafter the rates of fare shall be uniform and shall be jointly agreed upon. It is also agreed that the agreement shall continue in full force until one year after notice of proposed cancellation shall have been given by one of the parties to the other, or until it shall have been canceled by mutual consent, each company is also to furnish to the other a bond, in the sum of $5,000, with sufficient sureties, &c., for the faithful carrying out of the agreement.

A committee of three directors from each company is to be appointed, who shall constitute a " joint committee " and to whom shall be referred all matters of difference, pertaining to the general management of the two companies under this agreement. There is then a general provision that neither company is to have any management or control over the boats of the other company other than the direction, as therein agreed, of the time of running, of the places of landing, the rates of fare and freight and the disposition of the moneys received for freight and fare and that neither company shall be liable for debts contracted by the other, nor for wages, repairs, fuel, &c., that may be supplied, nor for damages incurred by the other by any collision or other accident, &c.

There is a further provision, to the effect, that if either of the parties shall fail to carry out the terms of the agreement, the other may at its option cancel the agreement, but the

fact of the failure of either company to keep the agreement shall be decided by a majority of the "joint committee."

I have recited the provisions of the agreement with so much particularity, in order that it might be clearly understood just what the arrangement was into which the two companies have entered and which the plaintiff seeks to enjoin, on the ground that the same is in conflict with the section of the act of 1854, quoted in full at the commencement of this opinion. It must be quite apparent to any one, after perusing the agreement, that whether there would be a combination of the two companies or not within the meaning of the statute, if the agreement should be carried into effect, there would be at the very least a complete union of the interests of the two companies. Neither could be interested in excelling the other, either in regard to accommodating the public with boats calculated to promote the comfort of their passengers or in the regularity or speed of their trips. If the agreement does not constitute a partnership between the two companies (which is a question not now necessary to be decided), it creates something which bears a strong resemblance to a partnership. At all events the agreement provides for a joining of the companies for the protection of certain supposed mutual interests and the disposition of this motion depends entirely upon the interpretation which is to be given to the word " combine " as employed in the statute.

The learned counsel for the defendants contend that the word " combine, as thus used, is only to be understood in what they designate as its bad sense, *i. e.*, to prevent that which is contrary to public policy, or injurious to the public, and that what is sought to be prevented by the act is a consolidation of the companies, or a combination, confederation or conspiracy. The word " *combine* " is not to be found in either of the dictionaries of Burrill or Bouvier, and I do not find it defined in the edition of Jacobs to which I have had access. Bouvier defines combination as a union of men for the purpose of violating the law, and as a union of different

elements. Jacobs, without specifically defining the word, states that " combinations to do unlawful acts are punishable before the unlawful act is executed ; this is to prevent the consequences of combinations and conspiracies," and he refers to the titles " confederacy and conspiracy." He defines confederacy to be " where two or more combine together to do any damage or injury to another, or to do any unlawful act." As to the meaning of the word "conspiracy," he says this word was formerly used almost exclusively " for an agreement of two or more persons falsely to indict one, or to procure him to be indicted of felony, now it is no less commonly used for the unlawful combination of workmen to raise their wages, or to refuse working except on stipulated conditions." Worcester defines " combine " thus : " to join together ;" " to coalesce ;" " to unite ;" " to be united ;" " to be joined in friendship or in design." And he defines " combination " to be a " union of persons for certain purposes ;" " association," " alliance," " coalition," " confederacy." And Roget, in his *Thesaurus*, classifies the word " combine " as synonymous with or belonging to the same class as " unite, incorporate, *amalgamate*, imbody, absorb, reimbody, blend, merge, fuse, melt into one, consolidate, *coalesce, centralize*, to impregnate, to put *together, to lump together.*" It is a familiar rule in the construction of statutes that the words of a statute are to be taken in their ordinary and familiar signification and import, and regard is to be had to their general and proper use, and that courts should not resort to subtle and forced construction for the purpose of either limiting or extending their operation (*Dwarris on Statutes by Potter, p.* 193 ; *McClusky* agt. *Cromwell*, 11 *N. Y.*, 601, 602, *and cases cited*).

Keeping this principle in view, I think that there can be no difficulty in determining precisely what the legislature intended in using the word " combine " in the twenty-second section of the act now under consideration. They did not intend to use, and did not use, that word in the strict technical legal sense which is maintained by the counsel for the

defendants.   The object of the legislature was to prevent coalitions, unions, mutual agreements, blendings of the companies which might be organized and incorporated, under the act, for any purpose.   Whether this was a provision which was wise or unwise, it is not for me to determine.   As I view it, the legislature did not intend to prevent the combination, of these companies *solely* as respects the commission of unlawful acts, but also as respects the arrangement of freight and passenger rates, and the numerous other matters which are specified in the agreement.   I have said that with the propriety of this provision it is not within the province of this court to deal; and yet it may be said, while on this point, that many considerations suggest themselves which go to show the propriety and necessity of such a provision.   The plain object of the legislature was to prevent the creation or formation of monopolies by the union or combination of these companies.   It can readily be seen that such a result might, and indeed almost necessarily would, result from such a combination.

This very case presents an illustration of this point.   Here are two companies which have been competing for the transportation of passengers and for public traffic; the rivalry and competition between them has been, according to the affidavits, most severe and keen.

The tendency of this competition, naturally, would be for the benefit of the traveling public, in reducing the rates for fares and freights.   Suddenly these competitors come together and make the agreement, which is the subject of consideration, for their "*joint benefit*," not for the benefit of the public.

Assuming, however, that the word "combine" is to receive the limited construction which is contended for by the defendant's counsel, and that it is to be taken in its bad sense, as intended to prevent something which is contrary to public policy or injurious to the public, it seems to me that the defendants must fail.   If the legislature designed by the pro-

Watson agt. Harlem and New York Navigation Company.

vision to prevent the formation or creation of monopolies, as I have endeavored to show, the creation or formation of such a monopoly is contrary to public policy and injurious to the public. On the argument, some affidavits were presented which were designed to prove that in point of fact the agreement referred to, if carried into execution, would redound to the benefit of the public by preventing racing and the dangers attendant thereon, and also by securing uniformity and regularity in the trips of the boats. To these affidavits the plaintiff's counsel claimed the right to reply in case the court deemed them of importance in the disposition of the case. Such leave would be given if I deemed those affidavits as having any weight in the determination of this controversy, but I do not. If the view expressed by me is correct the statute has made the act, which the defendants propose to perform and carry out, unlawful; and, however meritorious or advantageous it may be *per se*, the court has no alternative but to enforce the provisions of the statute.

The remaining question is as to the right of the plaintiff to maintain this action. As the plaintiff sues on behalf of himself and of such other of the stockholders as shall elect to join in the action, and as both of the corporations are before the court, it would appear that the action is properly brought (*Greaves* agt. *Gouge*, 49 *How. Pr.*, 79; *Gray* agt. *N. Y. and N. J. S. Co.*, 3 *Hun*, 383).

The motion to continue the injunction is granted, with costs of motion.